IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SENIOR LIFESTYLE CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>KEY BENEFIT ADMINISTRATORS, INC.,<br><br>Defendant. | Case No.: 1:17-cv-03447<br>Judge: |

## COMPLAINT

1. Plaintiff, Senior Lifestyle Corporation ("SLC") is a corporation incorporated under the laws of the State of Illinois. Its principal place of business is located in Chicago, Illinois.

2. SLC is the named fiduciary and plan administrator as those terms are defined, respectively, in Sections 402(a)(1) and 3(16)(A) of ERISA, 29 U.S.C. §§ 1102(a)(1) and 1002(16)(A), for an ERISA governed employee welfare benefit plan (the "plan").

3. Defendant Key Benefit Administrators, Inc. ("KBA") is incorporated under the laws of the State of Indiana. Its principal place of business is located in Indianapolis, Indiana.

4. At certain times, KBA performed administrative functions for the plan.

## JURISDICTION AND STANDING

5. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1332, and 1367.  SLC's claims arise under Sections 502(a)(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §§ 1132(a)(3), and under Indiana law.

6. This Court has exclusive subject matter jurisdiction over the ERISA claims.  29 U.S.C. § 1132(e)(1).  This Court also has diversity jurisdiction over all of the claims under

28 U.S.C. § 1332, and supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a).

## VENUE

7. Venue lies in the Northern District of Illinois pursuant to 28 U.S.C. § 1391(a)(2) because a substantial part of the events and omissions giving rise to SLC's claims occurred in this District. Similarly, venue in the Northern District of Illinois is proper under ERISA Section 502(e)(2), 29 U.S.C. § 1132(e)(2), because the plan is administered in this District. This division is appropriate because the SLC is headquartered in Chicago, Illinois.

## FACTUAL BACKGROUND

8. The plan provides certain benefits, including health insurance benefits to eligible SLC employees.

9. SLC and KBA entered into a contract (the "Contract") effective January 1, 2015 and attached hereto as Exhibit A.

10. Pursuant to the terms and conditions of the Contract, KBA agreed to perform certain services with respect to the administration of the plan.

11. These services included, KBA administering claims for benefits, paying claims for benefits from SLC assets, and coordinating the purchase of stop-loss insurance.

12. Under the Contract, KBA expressly agreed, among other things:

    a. To administer and pay claims for benefits made pursuant to the terms and conditions of the plan and to provide a provider network to participants. *See* Article I section B.2; B.3; B.10; B.11; B.12; B.19; B.20; B.23; Article II sections 1, 2, 4.

    b. To maintain records regarding claimants in order to determine whether claimants were entitled to benefits and to aid SLC in determining amounts owed to KBA

each month to cover claims and other related expenses. *See* Article I section B.4 ; B.5; B.8; B.9; B.10; B.11; B.12; B.22; Article II sections 2, 4, 5.

    c. To refund any overpaid fees. *See* Article I section B.6

    d. To make payments related to claims and other related expenses on behalf of the plan. *See* Article I section B.10; B.11; Article II section 4.

    e. To provide a monthly accounting of payments made on behalf of the plan with sufficient detail to enable SLC to track how its funds were used in connection with KBA's administration of the plan. *See* Article I section B.17; Article II section 5.

    f. To procure, administer, and maintain stop-loss insurance coverage for the plan. *See* Article I section B.23; Article II section 4.

13. In addition, KBA agreed to indemnify SLC for any and all claims, demands, and lawsuits arising out of or related to any act or omission by KBA involving gross negligence or willful misconduct with regard to KBA's duties.

14. The Contract was in force between January 1, 2015 and December 31, 2015.

15. To date, SLC has paid to KBA over six million dollars in plan benefit claims and administrative fees relating to the 2015 plan year.

16. During that time, SLC funded benefits to the plan and plan expenses through a General Claim Account (the "GCA"). Under the contract, KBA was authorized to access the GCA to pay claims and other plan related expenses, including premiums for stop-loss coverage.

17. KBA procured stop-loss coverage for SLC and was responsible for making monthly payments to the stop-loss carrier.

18. While SLC was responsible for paying all benefits due under the plan, the stop-loss policy limited the exposure of SLC. Specifically, under the stop-loss policy, if benefits under the plan exceeded a certain amount, the stop-loss carrier would reimburse SLC for the next up-to one-million dollars in claims SLC paid participants under the plan.

19. Stop-loss coverage is thus a very valuable for mitigating risk and hedging against unexpected fluctuations in cost.

20. SLC never received any reimbursement under the stop-loss policy.

21. On November 6, 2015, SLC learned that its stop-loss coverage had been cancelled due to KBA's failure to pay owed premiums to the stop-loss insurance carrier.

22. KBA claimed it ceased making stop-loss payments, because SLC had allegedly failed to make sufficient payments to KBA. On the same day that SLC's stop-loss insurance coverage was cancelled, KBA notified 44 other employers that their stop-loss coverage been cancelled. As with SLC, KBA had stopped making payments on their behalf to the stop-loss carrier.

23. Prior to the cancellation of stop-loss coverage, claims submitted and deemed payable under the plan exceeded the threshold required under the stop-loss policy for the stop-loss carrier to begin making reimbursements to SLC.

24. SLC however received no reimbursement from the stop-loss carrier. This is because, prior to the cancellation of stop-loss coverage, KBA failed to alert the stop-loss carrier that SLC had met the threshold under the stop-loss policy to trigger reimbursement.

25. Further, prior to the cancellation of stop-loss coverage, KBA never informed SLC that any of SLC's payments to KBA were deficient.

26. Prior to the cancellation of stop-loss coverage, KBA never informed SLC that it intended to stop making stop-loss premium payments.

27. Rather, throughout this period, KBA continued to claim it was processing claims and administering its duties under the Contract.

28. KBA's conduct harmed SLC by depriving it of the reimbursement funds it would otherwise have been due under the stop-loss policy. Absent KBA's failure to alert the stop-loss carrier that SLC had met the reimbursement threshold or absent KBA's failure to stop making stop-loss premium payments, SLC would have received up to one million dollars in reimbursement from the stop-loss carrier for benefit payments made by SLC.

29. On December 31, 2015, the Contract with KBA expired.

30. Under the Contract, it is KBA's responsibility to process run-out for six-months after the Contract's expiration, that is to process and administrator claims for benefits that arose in 2015.

31. During this run-out period, and indeed since the cancellation of the stop-loss insurance, SLC has repeatedly asked KBA for an accounting.

32. SLC seeks an accounting so that it can determine:

   a. The amount of money (if any) still owed by SLC to KBA;

   b.  How KBA spent the over 6 million dollars SLC has already paid to KBA;

   c. And to determine whether claims for benefits were properly processed by KBA in accord with the terms of the plan.

33. Despite repeated requests, to date KBA has not provided this information.

34. For example, on or about April 29, 2016, KBA informed SLC that SLC owed $1.697 million.

5

35. SLC asked for clarification as to how KBA arrived at this amount.

36. Then, on or about June 16, 2016, on its own accord, KBA informed SLC that SLC only owed $1.07 million.

37. KBA then processed a payment of $697,000 from SLC. SLC made this payment, all the while making clear that it needed an accounting to determine KBA's actual costs.

38. Thereafter, on or about June 28, 2016, KBA informed SLC that it owed $1.021 million.

39. As KBA was only responsible for paying claims incurred from January 1, 2015 to December 31, 2015, SLC asked KBA how despite a payment of $697,000 the amount allegedly owed by SLC had increased.

40. KBA has to date failed to credibly explain this fact.

41. Rather, in each interaction between SLC and KBA, KBA changes the amount it claims is owed while continuing to refuse to provide any underlying support or documentation.

42. In addition, KBA has to date not been able to account for how and when it disbursed the over $6 million in payment made by SLC since the Contract went into effect on January 1, 2015, or to provide information as to its basis for making individual claim decisions.

43. Further, KBA has been unable to explain how despite not being able to provide SLC with an accounting, it could nevertheless determine that insufficient funds existed to pay stop-loss premiums on SLC's behalf.

## **FIRST CLAIM**

### **(Breach of Fiduciary Duty Under ERISA Sections 502(a)( 3))**

44. SLC re-alleges and incorporates by reference paragraphs the prior paragraphs as though fully set forth herein.

45. KBA is a plan fiduciary by virtue of the discretionary authority KBA exercised over the administration of claims for benefits, payments of claims for benefits, and management of plan assets. 29 U.S.C. § 1002(21)(A)(i) & (iii).

46. KBA exercised discretion over the plan and management of plan assets by making determinations with respect to individual claims for benefits and whether those claims should be paid pursuant to the terms and conditions of the plan.

47. KBA exercised discretion over the plan and management of plan assets by paying claims for benefits out of the account established by SLC and funded by SLC.

48. ERISA Section 404(a)(1)(A) imposes a duty of loyalty on all plan fiduciaries.

49. ERISA Section 404(a)(1)(B) imposes a duty of care on all plan fiduciaries. 29 U.S.C. § 1104(a)(1)(B).

50. KBA breached its fiduciary duty by it repeated failure to explain how it used the over six million dollars SLC paid to KBA, to provide claim related detail, to document the amount of money it claimed remained owed, and to remit any overpayment.

51. Due to KBA's breach, SLC is unable to determine what if any additional funds are owed to cover claims for benefits made by plan participants.

52. Due to KBA's breach, SLC is unable to determine whether SLC overpaid to KBA any amount, which would entitle the plan to reimbursement.

53. Due to KBA's breach, SLC is unable to evaluate whether KBA properly decided claims for benefits.

54. KBA's disregard for plan participants has harmed the plan and SLC and unjustly enriched KBA.

55. Indeed, the behavior of KBA has been tainted by self-interest. KBA's unwillingness, to substantiate its use of funds provided by SLC, despite repeated requests by SLC, evinces that KBA seeks through obfuscation to retain funds to which it has no entitlement.

56. The plan and SLC have been damaged by paying to KBA compensation that KBA did not earn and for services that they were obligated to provide, but did not, or did not provide competently.

57. The plan and SLC have suffered as a result of KBA's breach and thus KBA must (1) provide SLC with an accounting of all expenditures made with respect to the plan, and (2) must restore to the plan any overpayment or profit realized as a result of their breaches. ERISA Section 409(a), 29 U.S.C. § 1109(a).

58. KBA also is liable to SLC for any attorney's fees that SLC has incurred as a result of this action. ERISA Section 502(g); 29 U.S.C. § 1132(g).

## SECOND CLAIM

### (Breach of Contract)

59. SLC re-alleges and incorporates by reference all prior paragraphs as though fully set forth herein.

60. SLC and KBA entered into the Contract effective January 1, 2015.

61. The Contract required KBA to, among other things,

   a. Reconcile eligibility and rate discrepancies on bills;

   b. Refund any overpayment of fees;

   c. Provide appropriate billings for all services and insurance coverages and remit collected funds to the appropriate party; and

   d. Submit a monthly accounting of payments made, with sufficient detail to provide for the tracking of funds used.

62. The Contract also required KBA to track all funds transferred to the GCA account and to use those funds solely for the purposes of paying claims and payment of other approved expenses.

63. KBA breached the Contract by failing to properly reconcile discrepancies in its bills, by failing to refund any overpaid fees, and by failing to submit a monthly accounting of payments made.

64. KBA breached the Contract by failing to track all funds paid to KBA by SLC.

65. KBA breached the Contract by failing to remit any overpayment to SLC.

66. KBA breached the Contract by failing to provide SLC with requested claim detail of benefits approved by KBA.

67. KBA breached the Contract by failing to make premium payments to SLC's stop-loss carrier.

68. KBA breached the Contract by failing to alert the stop-loss carrier, prior to cancellation, that SLC was entitled to reimbursement under the stop-loss policy.

69. KBA breached the Contract by failing to provide an accounting upon request.

70. SLC is entitled to an accounting under the Contract to determine the exact amount owed to KBA, and the overpayment due to SLC by KBA.

71. KBA's unwillingness to comply with the Contract and provide this accounting has caused KBA to become unjustly enriched by the overpayment by SLC and by earning interest on the overpaid amounts.

## THIRD CLAIM

### (Gross Negligence)

72. SLC re-alleges and incorporates by reference the prior paragraphs as though fully set forth herein.

73. KBA's failure to notify the stop-loss carrier that SLC had reached the reimbursement threshold constituted gross negligence above and beyond its breach of contract.

74. Under the Contract, KBA agreed to obtain and remit premium payments for stop-loss insurance.

75. KBA understands the purpose stop-loss coverage serves in a self-funded plan such as the plan.

76. Specifically, KBA was aware that stop-loss insurance helps keep a plan administrator's costs down, and helps a plan administrator hedge against month-to-month fluctuations in plan expenditures. KBA is aware that stop-loss insurance helps a plan administrator budget expenses with respect to the administration of the plan and the payment of claims.

77. KBA was aware of the purpose of stop-loss coverage and the financial stress and hardship that a lack of stop-loss coverage would have on SLC as the plan administrator.

78. KBA's failure to notify the stop-loss carrier that SLC had reached the reimbursement threshold constituted gross negligence because KBA knew that SLC would have been entitled to coverage, which in turn would have alleviated costs associated with paying up to $1 million in claims for benefits.

79. KBA's actions have caused SLC to incur extra expenses up to $1,000,000. These expenses would have been covered by the stop-loss policy. KBA knew that SLC would incur these expenses but for their failure to notify the carrier.

80. Due to KBA's knowledge of the importance of stop-loss coverage, KBA also was grossly negligent when it ceased making stop-loss insurance premium payments.

81. SLC made millions of dollars in payments to KBA for the 2015 plan year, far more than what was required to make stop-loss premium payments.

82. KBA's complete lack of knowledge as to how SLC's payments were spent vitiates KBA's position that SLC provided insufficient funds for KBA to make stop-loss payment.

83. Further, KBA's complete lack of knowledge as to how SLC's payments were spent also constitutes gross negligence. It defies reason that KBA as a third party administrator is unable to account for each penny that SLC has paid to it in connection with KBA's administration of the plan.

84. Due to KBA's gross negligence, SLC is entitled to punitive damages in an amount to be determined after trial.

## PRAYER FOR RELIEF

WHEREFORE, SLC prays for judgment as follows:

1. For a judgment in favor of SLC on all of its claims against KBA;

2. For appropriate equitable relief, including, but not limited to, an accounting and restitution, profit disgorgement, and a constructive trust over assets properly belonging to SLC, pursuant to ERISA § 502 (a)(3);

3. For attorney's fees pursuant to ERISA § 502(g);

4. For damages proximately flowing from KBA's breach of the Contract, including, but not limited to, damages flowing from the failure to timely notify the stop-loss carrier that SLC had met the reimbursement threshold and for the cancellation of the stop-loss policy;

5. For an accounting pursuant to the terms of the Contract;

6. For attorney's fees pursuant to the terms of the Contract;

7. For punitive damages stemming from KBA's gross negligence;

8. For pre- and post-judgment interest in an amount to be proven at trial;

9. For such other and further relief that the Court deems just and proper.

## DEMAND FOR JURY TRIAL

SLCs hereby demands trial by jury with respect to its second and third claims.

Dated:  May 8, 2017                                                 SENIOR LIFESTYLE CORPORATION

By: /s/ Samuel M. Schwartz-Fenwick
One of Its Attorneys

Samuel M. Schwartz-Fenwick, Bar No. 6287340
sschwartz-fenwick@seyfarth.com
James C. Goodfellow, Jr., Bar No. 6295043
jgoodfellow@seyfarth.com
SEYFARTH SHAW LLP
233 South Wacker Drive, Suite 8000
Chicago, Illinois  60606-6448
Telephone:     (312) 460-5000
Facsimile:      (312) 460-7000

Attorneys for SENIOR LIFESTYLE CORPORATION

28172007v.5
38987561v.1

## **CERTIFICATE OF SERVICE**

I, Samuel M. Schwartz-Fenwick, an attorney, do hereby certify that I have caused a true and correct copy of the foregoing COMPLAINT to be served upon the following by via process server.

>Wallace T. Gray, General Counsel
>Key Benefit Administrators
>8330 Allison Pointe Trail
>Indianapolis, IN 46250
>Wallace.Gray@keybenefit.com

>/s/ Samuel M. Schwartz-Fenwick
>Samuel M. Schwartz-Fenwick

28172007v.5
38987561v.1