UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| SENIOR LIFESTYLE CORPORATION, | ) | |
|---|---|---|
| Plaintiff, | ) | |
| v. | ) | No. 1:17-cv-02457-JMS-MJD |
| KEY BENEFIT ADMINISTRATORS, INC., | ) | |
| Defendant. | ) | |

**ORDER ON PLAINTIFF'S MOTION TO COMPEL**

This matter is before the Court on Plaintiff's Motion to Compel Production or Identification of Documents and for Leave to Take Limited Testimony on Same [Dkt. 258.] For the reasons set forth below, the Court **DENIES** the motion.

**I. Allegations in the Complaint**

As relevant to the instant motion, Plaintiff Senior Lifestyle Corporation ("SLC") alleges the following facts in its Complaint. [Dkt. 1.] SLC entered into an Administrative Services Agreement ("ASA") with Defendant Key Benefit Administrators, Inc., ("KBA") in 2015, pursuant to which KBA was to administer SLC's employee benefit plan. One of the provisions of the ASA required KBA to "[c]oordinate the purchase of stop-loss insurance coverage and provide stop loss claim administration" for SLC. [Dkt. 1-1 at 4.] KBA procured stop-loss coverage for SLC and KBA was responsible for making monthly payments to the stop-loss carrier. [Dkt. 1 at 4.] On November 6, 2015, SLC "learned that its stop-loss coverage had been cancelled due to KBA's failure to pay owed premiums to the stop-loss carrier." *Id.*

> KBA claimed it ceased making stop-loss payments, because SLC had allegedly failed to make sufficient payments to KBA. On the same day that SLC's stop-loss insurance coverage was cancelled, KBA notified 44 other employers that their stop-loss coverage been cancelled. As with SLC, KBA had stopped making payments on their behalf to the stop-loss carrier. . . . [P]rior to the cancellation of stop-loss coverage, KBA never informed SLC that any of SLC's payments to KBA were deficient.

*Id.* Due to KBA's failure to pay the premiums due under the stop-loss policy, SLC lost reimbursement of up to one million dollars from the policy. *Id.* at 5. SLC asserts claims for breach of fiduciary duty under ERISA and breach of contract.

## II. History of Discovery

Because the instant motion relates to SLC's desire to obtain additional discovery from KBA, a review of the history of discovery in this case as it relates to KBA's discovery responses is in order.[1]

The original deadline for non-expert witness discovery and discovery relating to liability issues in this case was May 18, 2018. [Dkt. 43 at 5.] On April 27, 2018, the parties filed a joint motion to extend that and other deadlines in this case by ninety days. [Dkt. 72.] This motion was based primarily on the fact that, on April 11, 2018, KBA had produced a spreadsheet consisting of 60 rows of information relating to all claims (over 32,000) received and processed by KBA during the time period relevant to this lawsuit. *Id.* The parties were in the process of obtaining the information that SLC would need to understand the various codes used in the spreadsheet. *Id.* SLC would then need time to review the information in the spreadsheet and it

---

[1] This discussion of discovery in this case largely omits reference to disputes that were raised and resolved regarding SLC's discovery responses.

2

did not want to take the depositions of certain KBA witnesses until after it had a complete understanding of the spreadsheet. *Id.*

In ruling on the joint motion to extend deadlines, the Court noted that the original case management plan had allowed 282 days for the completion of liability discovery and "the parties' motion is devoid of any explanation regarding why that time was insufficient for the parties to complete liability discovery." [Dkt. 73 at 1.] Although the Court "remain[ed] unconvinced that the parties ha[d] diligently prosecuted discovery in this matter, or that any enlargement [was] appropriate," the Court granted the joint motion in part and extended the deadline for non-expert witness discovery and discovery relating to liability issues to August 10, 2018, and the deadline for expert witness discovery and discovery relating to damages to January 18, 2019. *Id.* at 1-2. This necessitated moving the trial in this case from February 4, 2019, to June 17, 2019. *See* [Dkt. 78].

In conjunction with extending the deadlines, the Court ordered the parties to submit regular joint reports on the status of discovery. [Dkt. 75.] In the first such report, which was filed on May 8, 2018, the parties noted that KBA was in the process of supplementing its document production in response to a deficiency letter sent by SLC. [Dkt. 76.] At a May 10, 2018, discovery conference, the Court required Defendant to "file a report with the Court confirming the supplementation of its interrogatory responses, and either confirming the completion of its supplemental document production or providing a date certain by which that supplemental document production will be complete." [Dkt. 79.] That report was filed on May 18, 2018, and read as follows:

> Pursuant to the Court's Minute Entry [ECF No. 79], dated May 11, 2018, Defendant Key Benefit Administrators, Inc. ("KBA") submits this report on the status of its responses to Plaintiff Senior Lifestyle Corporation's ("SLC")

3

discovery requests. As agreed at the parties' May 10, 2018 discovery conference, KBA has supplemented its responses to SLC's interrogatories, numbers 4, 12, 15 and 18. KBA has also assembled additional responsive documents that it will produce to SLC the week of May 21, 2018 (and hopefully on May 21, 2018). In addition, in response to questions from SLC about the scope of KBA's document searches, KBA is in the process of performing additional searches to confirm the completeness of its search efforts. If these searches identify additional responsive, non-privileged documents, KBA will produce those documents by no later than June 1, 2018.

[Dkt. 81.] On June 5, 2018, the parties reported that KBA's supplemental production was still ongoing. SLC reported:

> While SLC served its discovery requests on September 26, 2017, it has learned from the parties' May 17, 2018 and May 24, 2018 meet and confer telephone conferences regarding KBA's electronically stored information ("ESI") searching and production, that KBA had not searched its custodians' back-up files and could not say for certain whether it had identified all documents responsive to SLC's requests. Accordingly, KBA informed SLC that it would be performing a search of its custodians' accounts using search terms that were agreed upon by the parties. On June 1, 2018, KBA informed SLC that the initial search was complete, and that counsel's review of the documents would begin "shortly," and that counsel expected to complete its review and production by July 1, 2018. To date, KBA is unaware as to how many documents were returned in the initial search, but the search returned approximately 61 GB of data.

[Dkt. 85 at 4.] In fact, approximately 98,000 documents were generated by KBA's follow-up search. KBA segregated over 80,000 of those documents as "non-responsive and/or properly withheld under the Federal Rules of Civil Procedure." The remaining documents were produced by KBA on a rolling basis. [Dkt. 90.]

In light of this ongoing discovery, on July 5, 2018, the parties filed a second joint motion to extend the remaining case management deadlines. [Dkt. 90.] This time, the parties asked to bump back the deadlines by 60 days but not to move the trial date. That motion was granted in part, and the deadline for non-expert witness discovery and discovery relating to liability issues was extended to September 7, 2018. [Dkt. 92.]

4

On July 17, 2018, the Court held a telephonic discovery conference "at the parties' request to discuss issues relating to the production of electronically stored information by Defendant." [Dkt. 100.] As a result of that conference, "Plaintiff was authorized to file a motion to compel with regard to the issues discussed if the parties are unable to resolve the dispute based upon the guidance provided by the Court." *Id.*

On August 2, 2018, the parties filed a Joint Motion for Entry of Attorneys' Eyes Only Protective Order. [Dkt. 101] In that motion, the parties noted that the protective order they sought was developed "[b]ased on guidance provided by the Court at a July 17, 2018 Telephonic Discovery Hearing, and pursuant to an agreement between the parties reached subsequent to that hearing." *Id.* The parties described their agreement and the process leading to it as follows:

> Key Benefits Administrators, Inc. ("KBA") processed approximately 98,000 documents collected from KBA's employees' mailboxes that either contain, or are attached to a document that contains, at least one of the following search terms: "SLC", "Senior Lifestyle", and/or "MTA 11070". During the attorney review of those documents, KBA's counsel identified approximately 85,000 non-privileged documents that it believes to be non-responsive and/or properly withheld under the Federal Rules of Civil Procedure based upon the use of supplemental search terms and/or attorney review ("Excluded Documents"). KBA has not produced the Excluded Documents.
>
> Based on guidance provided by the Court at a July 17, 2018, Telephonic Discovery Hearing, and pursuant to an agreement between the parties reached subsequent to that hearing, KBA's counsel will produce to SLC's counsel the extracted text of all non-privileged Excluded Documents under an "ATTORNEYS' EYES ONLY" designation ("AEO Production Documents").
>
> These documents will be produced by KBA no later than two (2) business days after the Effective Date of this Order. In addition, no later than two (2) business days after the Effective Date of this Order, KBA will produce to SLC all of the "search terms" it used to identify and segregate the Excluded Documents, as well as all of the agreed upon metadata for the Excluded Documents. In exchange, SLC shall cause—no later than seven (7) business days after the Effective Date of this Order—a total of $3,420.40 to be paid by check to Faegre Baker Daniels LLP.

5

*Id.* The Court entered the stipulated protected order requested by the parties. [Dkt. 102.]

On August 28, 2018, SLC filed a Motion Requesting Discovery Conference and to Keep Rule 30(B)(6) Deposition Open and to Extend the Dispositive Motion Deadline Pending the Outcome of the Parties' Discovery Dispute [Dkt. 109]. Among the discovery disputes at issue were: (1) KBA's claim of privilege over certain documents; and (2) information that was missing from the claims spreadsheet produced by KBA in April 2018. In addition, SLC noted that "in July [2018], KBA produced 14,000 documents. SLC only received this production following a series of meet and confers regarding KBA's deficient search for responsive documents. As SLC was not able to review an even close to complete document production until July 2018, it was in no position prior to this time to serve the second set of document requests, which had built on questions it had after reviewing the July production." *Id.* at 6. SLC had served its follow-up discovery requests on July 17, 2018, and there were several disputes regarding the adequacy of KBA's responses to them.

The Court held a discovery conference on September 6, 2018, at which the Court authorized SLC to file a motion to compel regarding the discovery dispute but denied the motion to extend the dispositive motion deadline. [Dkt. 123.] The Court explained: "[T]he parties' failure to have completed discovery is primarily the result of the parties failure to actively pursue discovery from the outset, therefore, good cause does not exist for enlargement of the dispositive motions deadline." *Id.*

SLC filed a motion to compel on October 5, 2018, that addressed the privilege issues. [Dkt. 127.] On November 5, 2018, the parties filed a joint motion stating that they had resolved the issues raised in the motion to compel and that SLC was withdrawing the motion. [Dkt. 140.]

On November 9, 2018, SLC filed a motion for partial summary judgment and KBA filed a motion for summary judgment. [Dkt. 146 and Dkt. 154.] Those motions were denied without prejudice following the revelation that SLC had failed to produce a large number of documents that were responsive to KBA's discovery requests. The supplemental document production that followed took several months. As a result, on March 22, 2019, the case management deadlines were once again extended so that KBA would have the benefit of the newly produced documents during the summary judgment process. A new deadline of May 24, 2019, for non-expert witness discovery and discovery relating to liability issues was established, and new dispositive motions deadlines were established as well.[2] [Dkt. 198.] The trial was continued to March 23, 2020. [Dkt. 204.]

In mid-November 2018, shortly after the motions for summary judgment were filed and eighteen months after the case was filed, attorneys from Barnes and Thornburg appeared on behalf of SLC. The attorneys from Seyfarth Shaw LLP who had originally represented SLC in this case withdrew their appearances in April 2019.

The parties filed joint status reports regarding discovery on April 9, 2019, [Dkt. 205], May 7, 2019, [Dkt. 214], June 4, 2019, [Dkt. 226], July 15, 2019, [Dkt. 239], and July 30, 2019, [Dkt. 246]. Each time SLC reported that there were no disputes regarding KBA's discovery responses.

On May 22, 2019, the parties filed a joint motion to stay deadlines pending a settlement conference. [Dkt. 216.] The Court denied that motion, but entered an order extending the

---

[2] Because cross-motions for summary judgment were anticipated, the Court established a four-brief schedule with SLC's motion being filed first. References to the dispositive motion deadline hereafter refer to the deadline for SLC's motion.

7

deadline for non-expert witness discovery and discovery relating to liability issues to August 9, 2019, and extending the dispositive motions deadline to September 6, 2019. [Dkt. 217.] As a result, the trial was continued to June 29, 2020. [Dkt. 247.]

On June 28, 2019, the Court issued an order authorizing KBA to redpose any witness in light of SLC's failure to produce responsive documents in a timely manner. [Dkt. 238.] In that order, the Court reminded the parties that the deadline for non-expert witness discovery and discovery relating to liability issues was August 9, 2019.

On July 19, 2019, KBA filed a Motion for Status Conference and to Extend Discovery Deadlines [Dkt. 242.] On July 25, 2019, a hearing was held on the motion, at which the Court extended the discovery deadline for certain depositions to August 23, 2019. [Dkt. 245.] The deadline for all other non-expert witness discovery and discovery relating to liability issues remained August 9, 2019. *Id.*

On August 22, 2019, the parties moved to adjust the summary judgment briefing schedule "to accommodate the Thanksgiving holiday." [Dkt. 250.] The parties reported that they were attempting to resolve an issue regarding SLC's privilege log. *Id.* This motion was granted in part, and the dispositive motion deadline was extended to September 16, 2019. [Dkt. 253.]

On September 11, 2019, SLC filed a motion seeking an extension of the impending dispositive motion deadline until 28 days after the Court ruled on the instant motion to compel, which SLC filed the following day. [Dkt. 255.] SLC reported that it had identified certain deficiencies in KBA's discovery responses that it believed warranted reopening discovery and deferring summary judgment briefing until the additional discovery was completed. The Court

8

granted the motion in part, extending the dispositive motion deadline to September 23, 2019, in order to permit the parties to brief and the Court to resolve SLC's motion to compel. [Dkt. 274.]

### III. The Instant Motion to Compel

SLC identifies four ways in which it believes KBA's discovery responses are deficient,[3] each of which is discussed, in turn, below.

### A. Data Regarding the October 1, 2015, Invoice

As noted above, this case involves the cancellation of SLC's stop-loss policy in November 2015. The stated reason for the cancellation was that SLC failed to make a payment that was due on October 1, 2015, before the expiration of the 30-day grace period for payments. KBA asserts that an invoice was sent to SLC on September 22, 2015, with a due date of October 1, 2015; when no payment on that invoice had been made by November 6, 2015, the policy was terminated.

A few weeks ago, SLC's counsel determined that they were unable to locate any documents relating to the transmission of the invoice among KBA's document production. SLC asserts in its motion that:

> In response, KBA told SLC for the first time that the invoice due October 1 was sent by a third party vendor, not KBA, and that the vendor destroyed the documents evidencing the transmission of that key invoice to SLC. It further told SLC for the first time that invoice due October 1 was sent from servers originally

---

[3] Two additional issues are raised in the motion to compel. First, SLC alleged that KBA had improperly cropped a spreadsheet that it had previously produced; SLC was incorrect on that point, and has acknowledged that fact. Second, SLC alleged that the redactions on a document (found at [Dkt. 261-6]) were not included on KBA's privilege log. In its response brief, KBA states that the document in question is, in fact, contained on its privilege log and that the redactions are appropriate because the redacted portion was sent for the purpose of obtaining legal advice. SLC does not mention the document in its reply brief, so the Court assumes it is satisfied by KBA's response.

9

belonging to a company named EZ Benefit, and thus the transmission email would not bear KBA's name, but EZ Benefit's name.

[Dkt. 268 at 6-7.] In response to SLC's counsel's request, KBA has now created and produced a spreadsheet consisting of data that KBA imported from the EZ Benefit system regarding the transmissions of invoices by EZ Benefit to SLC. The spreadsheet indicates that in addition to the invoice sent to SLC on September 22, 2015, another invoice was sent on October 5, 2015. Because those documents no longer exist,[4] it is unknown whether that second invoice replaced the October 1, 2015, payment due date with a new payment due date or whether it maintained the October 1, 2015, payment due date and simply provided additional information. If the former, SLC argues, its payment may not have been overdue when its policy was cancelled. Therefore, SLC argues,

> Senior Lifestyle needs to take additional, limited discovery regarding the information contained in the newly-produced data and specifically regarding the identified October 5 transmission. Without that additional discovery, given the destruction of the original documents, Senior Lifestyle cannot adequately defend against Key Benefit's allegations.

[Dkt. 279 at 12.]

SLC states that it was not aware until now that the invoice was emailed from EZ Benefits rather than KBA, and therefore it did not know to conduct a search of its own emails for transmissions from EZ benefits, but that is belied by the fact that, as KBA explains:

> SLC as an entity has known that the October and later invoice notifications would be sent from support@e-zbenefits.com since *at least September 16, 2015*, when Don Rath at SLC received an email from KeySolution.Billing@keybenefit.com, attached hereto as Exhibit C, informing SLC that it would "receive an automated

---

[4] SLC has now performed a search of its emails for communications from EZ Benefit and located the October 5 transmission of an invoice, although it is unable to access the invoice itself because the link to the document contained in the email no longer works.

email from support@e-zbenefits.com" notifying it when its October 2015 and later invoices were available on the EZBenefits portal for viewing. SLC's *lawyers* have known about the e-zbenefits.com communications since *at least January 11, 2018*, when *SLC* produced its version of the September 16 email (SLC023220). KBA produced its version of the email on July 2, 2018.

[Dkt. 275 at 6.] Regardless, SLC had ample time to realize that it did not have the invoices—which it represents are critical to its case—and request any additional information it wanted with regard to them during the discovery period in this case; it simply failed to do so. SLC's assertion that "the reality is that Key Benefit just informed Senior Lifestyle that the September 22 (due October 1) and October 5 invoice transmissions were destroyed and thus were not produced and could not be produced" is simply not accurate; the reality is that SLC knew or should have known long ago that the invoices had not been produced.

SLC argues that KBA should have produced the data contained in the newly created spreadsheet in response to SLC's discovery requests, and the fact that "KBA did not produce relevant data in its possession, but only information existing in document form, if true, raises significant questions about the integrity of KBA's production." [Dkt. 268 at 7 n.1.] This argument ignores the agreement reached between SLC's previous counsel and KBA regarding how KBA would search for and produce electronic information. As KBA describes it, "SLC and KBA painstakingly came to an agreement (with Court assistance) about how KBA would produce documents, including the form the production would take: documents, collected from email custodial files, not raw data from KBA's data management system." [Dkt. 265 at 1.] More specifically:

> • The parties agreed that KBA would conduct a follow-up search of its custodians' back-up files using general search terms that were agreed upon by the Parties (e.g., "SLC", "Senior Lifestyle Corporation" and "MTA 11070") to determine whether additional discoverable documents were available. [Dkt. 90, Joint Mot. for Extension at 2-3; Dkt. 102.]

11

- The parties agreed that, of the approximately 83,000 documents identified and segregated by KBA as non-responsive and/or properly withheld under the Federal Rules of Civil Procedure, KBA would extract text of all non-privileged documents ("Excluded Documents," approximately 85,000 in total) under an "ATTORNEYS' EYES ONLY" designation. [*Id.*]

- The parties agreed that KBA would produce all of the "search terms" it used to identify and segregate the Excluded Documents and all of the agreed upon metadata for the Excluded Documents. [Dkt. 102.]

- The parties agreed that some of the records relating to SLC's plan were with KBA's vendors, and thus, if produced, would be produced in redacted form. Accordingly, KBA accommodated SLC's requests to collect data from vendors when SLC asked. [*See, e.g.*, Ex. B, e-mail from KBA to SLC, dated Sept. 14, 2018, transmitting data from vendor (Caremark)].

*Id.* at 4. KBA further explains that it created spreadsheets containing data from its data management system when requested to do so by SLC, including when SLC asked KBA a few weeks ago to provide "confirmation of KBA's communications to SLC of when its invoices had been uploaded to KBA's 'EZ-Benefits' portal (where SLC could access them)." *Id.* at 6.

SLC does not dispute that the agreement described by KBA existed, but rather argues that KBA "should have at least informed [SLC that the raw data] existed, especially because the documents to which that data relates no longer exist and Senior Lifestyle's discovery requests expressly included requests for data, not just tangible documents." [Dkt. 271 at 7.] But, again, the fact that the discovery requests asked for data does not change the fact that counsel subsequently negotiated an agreement with regard to what data KBA was required to produce. It also does not change the fact that SLC knew or should have known that the critical documents in question were not contained in KBA's document production long ago; at that point, pursuant to the parties' agreement, SLC could have asked KBA to search for and produce anything relating to those documents in KBA's raw data (or that of its vendors).

SLC does not have the information it now seeks regarding the invoices because of its own failure to timely seek that information during the very lengthy discovery period in this case. Liability discovery is now closed (for the second time). Because SLC has provided no basis for permitting additional discovery regarding the invoices at this late date, its motion to compel on that issue is **DENIED**.

**B. Delinquency Report**

Next, SLC seeks additional discovery regarding a November 2015 "Delinquency Report" that SLC characterizes as "one of the most important documents in the case." [Dkt. 279 at 4.] SLC has known of the existence of the Delinquency Report since May 18, 2018, when KBA stated in its supplemental response to Interrogatory 4(e) that KBA employee Gretchen Wilkening provided "delinquency reports" to Oliver Ayres of RGI, LLC, an agent of KBA, in November 2015 that "identified all KBA clients that were delinquent on stop-loss premium payments." [Dkt. 261-8 at 5.] A few weeks ago, SLC asked KBA to produce the Delinquency Report. KBA has searched for the document and has been unable to locate it.

SLC argues that KBA's search for the Delinquency Report has been insufficient because KBA did not search for it in its email records. This is incorrect; as KBA explained in its response brief, KBA has searched its emails using the search terms agreed upon by the parties, and "[i]f the report contained information about SLC, the search terms would have hit on it—and if it was sent by email, it would have been collected and produced, at the very least in the AEO production." [Dkt. 275 at 8.] It is unclear what additional email searches SLC believes KBA should conduct. In addition, pursuant to SLC's recent request, KBA has conducted additional searches, which it has described in detail in the declaration of its general counsel, Wallace Gray.

[Dkt. 276-1.] SLC has failed to persuade the Court that these efforts were deficient in some manner.

> SLC argues that
>
> Senior Lifestyle and the Court are, at a minimum, entitled to know the information Key Benefit possesses relating to the purportedly lost or destroyed delinquency report, including whether Key Benefit still has the data contained in that report. If all that information is gone, Senior Lifestyle is entitled to know how and when the information disappeared. If it—either the document or the identical data in the report—are found, Senior Lifestyle should be allowed the opportunity to review the document or information and understand it with limited, additional testimony. Key Benefit still does not deny that the report is critical to the case. Justice requires, at the very least, that Key Benefit take the minimal steps necessary to find the document or explain its absence. If the document or information still cannot be produced, Senior Lifestyle should be entitled to an adverse inference as a remedy for the spoliation of evidence.

[Dkt. 279 at 8-9.] Had the past existence of the Delinquency Report just come to light, this argument would be reasonable. However, as noted above, such is not the case; SLC has known about the Delinquency Report since May 2018. SLC also has known or should have known that KBA had not produced it. The time to raise an issue regarding that lack of production was well over a year ago, and certainly before the expiration of the discovery period. SLC points to no reason why it could not have done so; nor does it allege that it could not have realized the relevancy or importance of the Delinquency Report until now. SLC's motion to compel therefore is **DENIED** to the extent that it seeks to reopen discovery to conduct discovery about the Delinquency Report.

**C. Termination Letters Sent to Other KBA Clients in November 2015**

SLC moves to compel KBA to produce the termination letters that were sent to other KBA clients in November 2015, the same time that SLC's stop loss policy was terminated. KBA explains in response that the letters were not produced because they were not identified by the

14

search terms agreed upon by the parties. SLC does not dispute that fact, but argues in its reply brief that KBA should nonetheless be required to produce them because the "information is relevant and there is no hardship to Key Benefit producing the requested information." [Dkt. 279 at 13.] This argument, of course, fails to acknowledge and address the fact that SLC had over a year to request the information—which it clearly should have known was not produced as a result of the parties' agreed upon search terms—and simply failed to do so. SLC has not articulated any reason why discovery should be reopened at this late date to permit it to remedy this failure. Accordingly, SLC's motion to compel is **DENIED** with regard to this information.

### D. Spreadsheet Redactions

Finally, SLC seeks additional discovery about a spreadsheet KBA originally produced with heavy redactions. SLC notes that "[i]n recent depositions, two witnesses testified that the document was not originally redacted. Days after those depositions, Senior Lifestyle asked Key Benefit to explain its redactions and to produce the document in unredacted form." [Dkt. 271 at 3.] KBA produced the unredacted version on September 11, 2019.

> SLC now argues:
>
> The new information lists Key Benefit customers who had stop-loss policies and identifies whether those policies should be terminated. From metadata associated with that document, Senior Lifestyle believes the document was created just days before Senior Lifestyle received a termination notice of its stop-loss policy. The identities and termination recommendations for other Key Benefit customers, alone, would be relevant to understanding Key Benefit's recommendation to terminate Senior Lifestyle in relation to those other Key Benefit customers. But, the number of recommended terminations in the document is a small fraction of those Key Benefit customers whose policies were ultimately terminated. The reasons for that difference is relevant to understanding Senior Lifestyle's own stop-loss termination. Key Benefit does not dispute that the now-unredacted information is relevant to the central questions of this case.

[Dkt. 271 at 4.] "Senior Lifestyle simply wants the opportunity to investigate, with

15

limited, additional discovery, the meaning, origin and use of the newly-produced evidence." *Id.*

At the risk of sounding like a broken record, the fact that SLC did not receive the unredacted version of the spreadsheet until after discovery closed is SLC's fault. SLC has had the redacted version of the spreadsheet since July 6, 2018. The redactions were not hidden; they are quite obvious. If the redactions were improper, SLC had over a year to raise and resolve that issue. It failed to do so in a timely manner. SLC's request to reopen discovery to follow up on the information in the previously redacted portion of the spreadsheet is **DENIED**.

### IV. Conclusion

For the reasons set forth above, Plaintiff's Motion to Compel Production or Identification of Documents and for Leave to Take Limited Testimony on Same [Dkt. 258] is **DENIED**.

SO ORDERED.

Dated: 20 SEP 2019

Mark J. Dinsmore
United States Magistrate Judge
Southern District of Indiana

Distribution:

Service will be made electronically on all
ECF-registered counsel of record via email
generated by the Court's ECF system.