UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| SENIOR LIFESTYLE CORPORATION, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| *vs.* | ) | No. 1:17-cv-02457-JMS-MJD |
| | ) | |
| KEY BENEFIT ADMINISTRATORS, INC., | ) | |
| | ) | |
| *Defendant*. | ) | |

**ORDER**

On May 8, 2017, Plaintiff Senior Lifestyle Corporation ("SLC") filed a Complaint against Key Benefit Administrators ("KBA"), alleging that KBA breached its fiduciary duty under ERISA Section 502(a)(3), breached the contract it had with SLC, and acted with gross negligence resulting in SLC incurring extra expenses up to $1,000,000. [Filing No. 1 at 6-11.]

On September 23, 2019, SLC filed a Motion for Partial Summary Judgment, [Filing No. 283], in which it argues that it is entitled to partial summary judgment on the issue of KBA's liability under the breach of contract and ERISA claims. In response to SLC's Motion for Partial Summary Judgment, KBA filed a Cross-Motion for Summary Judgment, [Filing No. 304], alleging it is entitled to judgment in its favor on the claims against it. The parties have filed briefs in support of and in opposition to these motions, and SLC filed a Motion for Leave to File a Limited, Four-Page Surreply, [Filing No. 345], which KBA opposes, [Filing No. 350]. All of these motions are ripe for the Court's decision.

**I.**
**LEGAL STANDARD**

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment

1

as a matter of law.  *See* Fed. R. Civ. P. 56(a).  As the current version of Rule 56 makes clear, whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits.  Fed. R. Civ. P. 56(c)(1)(A).  A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact.  Fed. R. Civ. P. 56(c)(1)(B).  Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated.  Fed. R. Civ. P. 56(c)(4).  Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment.  Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision.  A disputed fact is material if it might affect the outcome of the suit under the governing law.  *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009).  In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome determinative.  *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005).  Fact disputes that are irrelevant to the legal question will not be considered.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events.  *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003).  The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party.  *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009).  The court views the record in the light most favorable to the non-moving party and

draws all reasonable inferences in that party's favor. *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008).  It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011).  The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has "repeatedly assured the district courts that they are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them." *Johnson*, 325 F.3d at 898.  Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Ponsetti v. GE Pension Plan*, 614 F.3d 684, 691 (7th Cir. 2010).

"The existence of cross-motions for summary judgment does not, however, imply that there are no genuine issues of material fact." *R.J. Corman Derailment Servs., LLC v. Int'l Union of Operating Engineers*, 335 F.3d 643, 647 (7th Cir. 2003).  Specifically, "[p]arties have different burdens of proof with respect to particular facts; different legal theories will have an effect on which facts are material; and the process of taking the facts in the light most favorable to the non-movant, first for one side and then for the other, may highlight the point that neither side has enough to prevail" on summary judgment. *Id.* at 648.

Despite the well-known nature of the foregoing standard, both parties appear to have disregarded their responsibility to demonstrate their entitlement to judgment by addressing the evidence in the light most favorable to the other party.  Instead each argues its version of events and draws inferences in its own favor. This practice has proved particularly unhelpful to the Court.

## II.
### FACTUAL BACKGROUND[1]

The following factual background is set forth pursuant to the standards outlined in Federal Rule of Civil Procedure 56, detailed above.  *See* Fed. R. Civ. P. 56(a).  The facts stated are not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light most favorable to "the party against whom the motion under consideration is made." *Premcor USA, Inc. v. Am. Home Assurance Co.*, 400 F.3d 523, 526-27 (7th Cir. 2005).  Because of the competing motions, that facts set forth below may at times appear contradictory. That inconsistency is simply a function of the presentation of certain facts in favor of the non-movant as required by law.  It also underscores the basis of the Court's ultimate resolution of the motions.

In 2015—the time period relevant to this action—SLC managed approximately 170 senior living communities across the country.  [Filing No. 285-1 at 34-35.]  SLC's healthcare plan for its employees was self-funded by SLC, and SLC was the healthcare plan's sponsor.  [Filing No. 305-3 at 4.]

KBA "is a third-party benefit administrator that supervises the operating of self-funded welfare benefits plans sponsored by the employers, such as SLC." [Filing No. 305-2 at 6.]

---

[1] The parties filed several of their briefs and exhibits under seal. The Court recognizes that it is citing documents that were filed under seal; however, it attempts to do so without revealing any information that could be reasonably deemed confidential.  If the Court does, however, discuss confidential information, it has done so because it is necessary to explain the path of the Court's reasoning.  *See In re Specht*, 622 F.3d 697, 701 (7th Cir. 2010) ("Documents that affect the disposition of federal litigation are presumptively open to public view, even if the litigants strongly prefer secrecy, unless a statute, rule, or privilege justifies confidentiality."); *Union Oil Co. of Cal. v. Leavell*, 220 F.3d 562, 568 (7th Cir. 2000) (explaining that a judge's "opinions and orders belong in the public domain").

On November 19, 2014, SLC and KBA entered an Administrative Services Agreement for Medical Plan Administration (the "Agreement"), whereby KBA agreed "to provide administrative services with respect to [SLC's] Employee Welfare Benefit Plan . . . in consideration of the payment by [SLC] of the fees and the agreements recited" in the Agreement.  [Filing No. 284-1 at 2.]  As part of this arrangement, SLC agreed to perform certain actions including: (1) "[d]etermine the eligibility of employees and dependents to receive benefits";  (2) "inform KBA of the addition or deletion of persons covered by the Plan"; (3) "[r]econcile eligibility and notify [KBA] of any discrepancies as soon as administratively possible, but no later than 60 days of the bill date"; and (4) "[p]ay all billings exactly as billed in a timely manner until any eligibility or billing issues are resolved."  [Filing No. 284-1 at 2.]  In the Agreement, KBA agreed to: (1) "[r]econcile eligibility and rate discrepancies on bills following receipt of updated information from [SLC]"; (2) "[r]efund to [SLC] any overpayment of fees based on the reconciliation of employer's monthly billing with such refund to be limited to up to 90 days of overpayment"; (3) "[p]rovide appropriate billings for all services and insurance coverages and remit collected funds to the appropriate party"; (4) "[r]eport to [SLC] essential information with respect to the Plan and the procedures there under (sic) and assist in distribution of the material furnished"; (5) "[r]eport to [SLC] matters of general interest with respect to the Plan, e.g., problems of a recurring nature"; (6) "[s]ubmit to [SLC] a monthly accounting of payments made, with sufficient detail to provide for the tracking of funds used"; and (7) "[c]oordinate the purchase of stop-loss insurance coverage and provide stop loss claim administration."  [Filing No. 284-1 at 4-5.]  The Agreement also established the relationship between the parties, stating: "1. Nothing in this Agreement shall be construed as creating a fiduciary relationship between [KBA] and [SLC] or participants in the Plan," and "2. [KBA] shall

act under this Agreement solely as agent of [SLC] in the administration of the Plan." [Filing No. 284-1 at 8.] The Agreement also included an anti-waiver provision that stated:

> Failure by either party to insist upon compliance with any term or provision of this Agreement at any time or under any set of circumstances will not operate to waive or modify that provision or render it unenforceable at any other time whether the circumstances are or are not the same. No waiver of any of the terms or provisions of this Agreement will be valid or of any force or effect unless in each instance the waiver or modification is contained in a written memorandum expressing such alteration or modification and executed by the parties.

[Filing No. 284-1 at 10.] The Agreement was for a one-year term, and SLC chose not to renew it for the 2016 plan year. [Filing No. 305-2 at 69.]

SLC received an Employer Administration Manual from KBA, which "was written to help [SLC] understand KBA, [SLC's] new medical benefits, and [SLC's] responsibilities as an employer to ensure the proper functioning of [its] plan." [Filing No. 314-2 at 107.] The manual states that "[o]n the 18th of each month, KBA will generate a monthly invoice for premiums and fees due for the following month." [Filing No. 314-2 at 112.] KBA would send the bill to SLC's designated representative via secure email, and the bill would "include a list of covered employees, the products they have selected, and the charges for each of these products." [Filing No. 314-2 at 112.] The manual also instructed that

> [t]he bill is due before the first of the next month. So a bill run on January 18th would be due on January 31st. It is important to pay as billed and on time. This allows for proper claim funding and prevents delays in claim payments.
>
> There is a 30-day grace period for each invoice before the client is terminated due to non-payment. However, late payments will result in a delay in claims payment. So always pay on time and as billed.

[Filing No. 314-2 at 112.]

As third-party administrator, KBA coordinated the purchase of stop-loss insurance coverage through a vendor, RGI, LLC ("RGI"), a managing general underwriter.  [Filing No 305-4 at 11.] The stop-loss insurance carrier was Companion Life Insurance Company ("Companion").  [Filing No. 314-2 at 122-205.] SLC was the policyholder of the stop-loss insurance policy.  [Filing No. 314-2 at 122-205.] SLC had a contractual relationship with Companion as SLC's stop-loss insurance carrier and had a contractual relationship with KBA as SLC's third-party administrator.  [Filing No. 305-4 at 11.]  KBA had a relationship with RGI as KBA's vendor for stop-loss insurance (for the benefit of SLC), and RGI had a relationship with Companion as a managing general underwriter.  [Filing No. 305-4 at 11.]  RGI and KBA are part of the "Key family of companies," which "is an informal [business name] for the collection of corporations and LLCs" that are used for conducting various business, and "[f]or W-2 purposes, all of the employees for the various companies are KBA employees," and KBA has "leasing arrangements with the companies to lease employees to the various companies."  [Filing No. 305-2 at 6.]  Larry Dust is the sole owner of KBA, and he also serves as KBA's CEO.  [Filing No. 285-12 at 8; Filing No. 305-1 at 5.]  RGI is owned by the Dust Family Trust, and Larry Dust is RGI's CEO.  [Filing No. 285-12 at 11.]  Approximately 90% of RGI's business comes from KBA clients.  [Filing No. 285-8 at 18.]  For the 2014 plan year, approximately 92.9% of RGI's stop-loss clients were placed with Companion; for the 2015 plan year, approximately 85.5% of RGI's stop-loss clients were placed with Companion.  [Filing No. 285-11 at 24.]

KBA was responsible for billing and collecting fees from SLC and remitting those collected fees to the appropriate parties.  [Filing No. 305-4 at 8.]  SLC would make monthly payments to KBA, which included a flat administrative fee for KBA's services, as well as payments for stop-loss insurance premiums and to fund the claims for SLC's self-funded plan.

[Filing No. 305-5 at 5.] The stop-loss premium payment was part of the collected fees, and KBA would remit that premium to RGI, who would then remit the premium to Companion. [Filing No. 305-4 at 7-8.] The stop-loss premium was due to Companion on or before the first day of each calendar month. [Filing No. 314-2 at 151.] Companion provided a thirty-day grace period for payment of the monthly premiums. [Filing No. 314-2 at 151.] However, if a premium was not paid during the grace period, the stop-loss insurance policy would "terminate without further notice retroactive to the date for which premiums were last paid." [Filing No. 314-2 at 151.] RGI relied on KBA "to manage the billing and collection of the premium," and if the premium was not collected in full, RGI relied on KBA to collect the remaining amount owed. [Filing No. 305-4 at 9-10.]

KBA's invoices were created based on information from SLC regarding "which of their employees has signed up for the coverages being offered by the employer," which changed month to month. [Filing No. 305-2 at 37.] The information was to be transmitted to KBA in specific file format, which would then be recognized by KBA's electronic data interchange program and provided to the billing expert to create the invoice. [Filing No. 305-2 at 38.] The specifications and system requirements for uploading the data were not included in the Agreement, the Plan manual, the application, or the Plan document itself. [*See* Filing No. 327 at 31.] There were ongoing problems with SLC's attempts to upload and transfer its eligibility information, due, in part, to multiple failures to meet KBA's system requirement by UltiPro, SLC's eligibility vendor. [Filing No. 305-2 at 40; Filing No. 305-2 at 42.] UltiPro was one of about 180 eligibility vendors and/or employers that had this problem. [Filing No. 305-2 at 46.] "KBA worked with [UltiPro] to try to correct these problems," and even processed SLC's information by having KBA's IT department manually input the eligibility information. [Filing No. 305-2 at 44.] In manually

loading SLC's eligibility information, KBA believed it was going "above and beyond what [it was] contracted to do," but it did so to be able to generate an invoice for SLC.  [Filing No. 305-2 at 44.] KBA could only use the information that SLC successfully provided.  [Filing No. 305-2 at 42.]

The monthly invoices KBA sent to SLC included the following instructions:

> 1.  Please pay as billed.  Send page one of this invoice along with a check made payable to KBA Self Funded for the total amount due to the address on this invoice.
> 2.  If this invoice needs adjustments, write each adjustment in the column "Employee Notes."  Please continue to pay as billed.
> 3.  Include copies of any pages of this invoice where you have noted needed adjustments.
> 4.  All adjustments noted on the invoice will be reflected on your next invoice.

[Filing No. 285-17 at 2.]  The invoices included the due date, the current amount due for that month, a balance forward (for any payments that remained outstanding), and a total amount due (which was the total of the current amount due and the balance forward).  [Filing No. 285-17 at 2.] The balance forward section of the invoice "highlights the fact that that you haven't paid your entire billed amount.  And that's the flashing light that you haven't paid in full and that you need to."  [Filing No. 305-4 at 8.]  The invoice did not separately set out the amount of the bill that was dedicated to the payment of the stop-loss premium.  [Filing No. 305-1 at 17.]

The invoices were sent to Dwana Battee, SLC's benefits administrator.  [Filing No. 285-17 at 2; Filing No. 314-3.]  When Ms. Battee would get an invoice, she would pull a data report of all of the people who were enrolled in the plan to make sure that the list of people in KBA's invoice matched SLC's records and to make sure that all of the information in the invoice was correct. [Filing No. 314-3 at 15.]  She would then send that data to accounts payable, who would prepare the payment to KBA.  [Filing No. 314-3 at 11.]  Ms. Battee's "focus was to make sure that the number of people that [SLC was] being billed for matches the number of enrollees that [SLC had]

enrolled for—because if not, then we'd have to figure out where the discrepancy is." [Filing No. 314-3 at 16-17.] Ms. Battee was aware that SLC was regularly paying less than KBA had identified as the current amount due and the total amount due. [Filing No. 314-3 at 30-31.] Ms. Battee testified that SLC was not paying the bill "as billed," but was instead paying "for what SLC determined to be the amount that was owed" based on its census data. [Filing No. 314-3 at 31; Filing No. 305-3 at 5.] KBA's billing specialist testified that

> [e]very few months [Ms. Battee] had eligibility issues, and we generally were discussing the fact that [Ms. Battee] didn't pay for somebody because she didn't feel like they should have been on the bill. . . . I generally would always tell [Ms. Battee] that she still needs to pay the bill as billed, . . . [and] I would fix the person so we can get it corrected on the next month's bill."

[Filing No. 305-9 at 28.]

When KBA received SLC's single monthly payment, it automatically allocated the funds among the Plan's component parts, including the premium owed to Companion for stop-loss insurance, using "a fixed ratio, using a mathematical formula." [Filing No. 305-6 at 4; Filing No. 285-4 at 26.] KBA would remit the amount for the Companion premium to RGI, who "would then record the payment and then make sure the payment was made to Companion." [Filing No. 285-4 at 26.] KBA would allocate, based on the formula, whatever was paid to all of the entities KBA owed so that all of the entities would be "shorted," not just one entity. [Filing No. 285-8 at 5.] RGI would not necessarily know that its portion was shorted, because KBA was the party that had access to SLC's census data, which determined the amount owed for the stop loss coverage. [Filing No. 285-8 at 5.]

On a few occasions, SLC asked KBA to manually update an invoice that had been automatically generated to reflect eligibility data that was different than the data previously provided by SLC. [Filing No. 305-11 at 3.] Making these manual updates caused delays in KBA

sending the invoices to SLC.  [Filing No. 305-11 at 3.]  KBA's billing specialist recalls that this happened with the October 2015 and November 2015 invoices.  [Filing No. 305-11 at 3.]  When KBA would send the invoices to SLC, it originally did so by emailing Ms. Battee the invoice in two forms: PDF and Excel.  [Filing No. 305-11 at 3.]  However, beginning with the October 2015 invoice, KBA used the EZBenefits platform to make invoices available to employers online. [Filing No. 305-11 at 3.]  KBA advised SLC of this change in a September 16, 2015 email, which provided SLC with a guide and credentials for accessing the portal and indicated that SLC would receive an automated email from EZBenefits "[i]mmediately following the upload of the invoice to EZB."  [Filing No. 305-13 at 2-4.]  When KBA uploaded the PDF and Excel versions of the invoice separately to the EZBenefits portal, an automatic email notification from EZBenefits for each separate upload would be sent to the employer's designated contact person notifying them that the invoice was available for viewing.  [Filing No. 305-11 at 3.]  KBA generated SLC's October 2015 invoice on September 16, 2015 and uploaded the PDF version to the EZBenefits portal on September 22, 2015.  [Filing No. 305-11 at 3.]  KBA uploaded the Excel version of the October 2015 invoice to the portal on October 5, 2015.  [Filing No. 305-11 at 3.]  KBA contends that other than the format of the file (PDF or Excel), there are no differences between the two invoices uploaded; however, the documents themselves are no longer available.  [Filing No. 305-11 at 3.]

In the Fall of 2015, RGI brought to Companion's attention the fact that several of the stop-loss policyholders from which KBA was collecting premiums were not paying their bills.  [Filing No. 305-1 at 12.]  KBA contends that, prior to notifying RGI, it was trying to work with the delinquent employers "to try to help them help themselves" and "get them to pay their bills and pay them on time," but there were "enough cases that were behind on their premiums that, in fact,

as RGI, it was time to go talk to Companion about . . . what KBA has been doing." [Filing No. 305-1 at 12.]  Companion instructed RGI to ensure that the past-due numbers were correct and, if so, then those stop-loss policies must be terminated.  [Filing No. 305-1 at 13.]  KBA asserts that it was interested in trying to save those accounts because that is how KBA gets paid (and RGI gets paid), so KBA lobbied with Companion to allow a second review of the past-due premiums, and: (1) if the termination was based on facts that were proven to be inaccurate, then the termination could be rescinded; or (2) if the termination was based on accurate information, the terminated policyholders would be given an offer to reinstate the stop-loss policy on new terms.  [Filing No. 305-1 at 13-14.]  Although this was not something that Companion had done before, it agreed to allow rescission or reinstatement offers following a second review of the past-due premiums. [Filing No. 305-1 at 14.]

Oliver Ayres (RGI's president) and Larry Dust (as CEO of RGI) met to review all of the employers with past-due premiums that were subject to termination by Companion.  [Filing No. 285-8 at 21.]  They reviewed a report provided by KBA listing the employers who were believed to have failed to pay their premiums in full and on time, and they confirmed which groups had failed to pay their premium in full and were outside the thirty-day grace period.  [Filing No. 285-8 at 21; Filing No. 285-8 at 24.]  If both factors were met, then RGI would send that employer a termination notice.  [Filing No. 285-8 at 21.]  RGI determined that SLC failed to make an October 2015 payment, and that the thirty-day grace period had passed, so it sent a termination notice to SLC on November 6, 2015.  [Filing No. 285-8 at 22; Filing No. 285-8 at 24.]  Although KBA would usually send an employer a "lapse letter" informing it that it was subject to termination of its contracts, KBA chose not to send a lapse letter to SLC because, according to KBA, "[SLC] had actual, firsthand knowledge through the discussions between [KBA's billing specialist] and [Ms.]

Battee that [SLC was] behind in [its] payments." [Filing No. 285-4 at 19.]  However, the billing specialist testified that she does not recall if she told Ms. Battee that there would be consequences if the invoices were not paid in full.  [Filing No. 305-9 at 28.]

During the time that this review of employer payments took place, RGI was in communication with Sirius (Companion's reinsurer, who was an additional risk-taker in the stop-loss policies), and they discussed projections of a potential large loss if certain employers filed stop-loss claims, but RGI's President, Oliver Ayres, testified that this projection did not factor into his consideration of whether SLC's stop-loss policy should be terminated.  [Filing No. 305-4 at 49-51.]

By November 6, 2015, Jarolynn Gadson had replaced Ms. Battee as SLC's benefit coordinator.  [Filing No. 305-11 at 3.]  Ms. Gadson started at SLC on October 12, 2015 and Ms. Battee left SLC on October 16, 2015 after giving one week's notice.  [Filing No. 314-7 at 5.]  When Ms. Gadson received the termination letter from RGI, she called Mr. Dust and advised him she would overnight a check to RGI "first thing on Monday" once RGI informed her of the amount that SLC owed.  [Filing No. 314-12 at 61; Filing No. 314-2 at 206; Filing No. 314-7 at 13-14.] Mr. Dust advised her that he would notify RGI and Companion that SLC's payment would be coming and that he would lobby to have Companion provide a reinstatement offer.  [Filing No. 314-12 at 61; Filing No. 314-2 at 206; Filing No. 314-7 at 13-14.]  However, SLC did not make the payment to RGI.  [Filing No. 314-11 at 2.]  SLC made a partial payment toward the October invoice on October 29, 2015—28 days after the October 1, 2015 due date—which was insufficient to pay the full October 2015 balance.  [Filing No. 305-12 at 2.]

The review of SLC's payments to KBA "showed that, from the very beginning, the invoices that were sent to SLC were never paid in full, and that [the] amounts shown as balance

forwards were not made up," and "there was no evidence that there had been some mutual mistake. It was a situation of the SLC people not paying the invoice in full and on time." [Filing No. 305-2 at 65.] SLC maintains that other than the balance forward section on the invoices, "KBA never informed SLC that any of its payments were deficient or in breach of the Agreement," and "never took issues with any of SLC's payments." [Filing No. 305-3 at 5.] However, KBA contends that during phone conversations with Ms. Battee, KBA's billing specialist discussed the issue of SLC not paying the full amount. [Filing No. 305-9 at 27.]

### III.
### DISCUSSION

The Court will first address SLC's breach of contract claim, then will consider the breach of fiduciary duty claim.

### A.  Breach of Contract Claim

#### 1. The Parties' Arguments

Each party claims that the other party breached the Agreement.  SLC argues that KBA breached the Agreement by failing to act solely as SLC's agent; instead, KBA acted in the interest of RGI and Companion.  [Filing No. 287-1 at 20-21.] SLC argues that KBA's breaches of the Agreement include: (1) "recommending and facilitating a termination inconsistent with the parties' historical conduct"; (2) "not attempting to accurately account for SLC's Plan obligations"; (3) "not paying SLC's stop-loss policy premiums"; (4) "changing SLC's payment terms"; (5) "not informing SLC that its stop-loss policy was perceived as underpaid and at risk of termination"; and (6) "not acting in SLC's sole interest, as the Agreement required." [Filing No. 287-1 at 21.] SLC contends that these breaches caused SLC's stop-loss policy to be improperly terminated. [Filing No. 287-1 at 21.] SLC asserts that it did not miss the October 2015 payment and, moreover, that KBA had previously accepted SLC's payments of what SLC believed was owed, without any

14

comment to SLC about its payments being deficient.  [Filing No. 287-1 at 21-22.]  SLC argues that, under Indiana law, KBA acquiesced to SLC's conduct for nine months, and KBA should not be able to use SLC's alleged breach of the payment terms as a basis for KBA's actions.  [Filing No. 287-1 at 22.]  SLC argues that KBA cannot rely on the anti-waiver provision in the Agreement because it consistently accepted less than what it believed it was owed and then, without notice, changed its position on the matter.  [Filing No. 287-1 at 22.]  SLC argues that KBA has admitted that its invoices were inaccurate and not timely, which in and of itself is a breach of the Agreement.  [Filing No. 287-1 at 23.]  SLC argues that, in fact, it had actually overpaid its Plan obligation at the time its stop-loss policy was terminated.  [Filing No. 287-1 at 24.]  SLC also argues that KBA failed to disclose information that was essential, or at least of general interest, to SLC's Plan, which is a separate breach of the Agreement.  [Filing No. 287-1 at 25.]  SLC contends that KBA's relationships with SLC, RGI, and Companion were in conflict, and KBA breached its duty to act solely as the agent of SLC.  [Filing No. 287-1 at 26.]  SLC argues that KBA does not have the evidence necessary to prove that on November 6, 2015, SLC had not paid an invoice due October 1, 2015 or that SLC's stop-loss premium payments were otherwise deficient.  [Filing No. 287-1 at 29.]

In response and in support of its Cross-Motion for Summary Judgment, KBA argues that "[i]f SLC had simply done what it was supposed to do under the [Agreement], none of the problems that SLC complains about in this lawsuit would have happened."  [Filing No. 316 at 40.]  KBA argues that SLC's breach of contract claim is foreclosed because SLC first breached the Agreement by failing to pay KBA's invoices as billed and failing to supply KBA with accurate eligibility and enrollment data.  [Filing No. 316 at 41.]  KBA argues that even though there were problems with KBA getting the eligibility data, KBA's invoices were accurate as to the data that SLC provided.

[Filing No. 316 at 44.]  KBA contends that the Agreement did not entitle SLC to do its own pre-payment reconciliation of the invoice using its own employee census data to determine what amount SLC believed it owed; instead, SLC was required—and was repeatedly reminded—to pay the invoice as billed.  [Filing No. 316 at 45.]  KBA also argues that it did not acquiesce in SLC's failure to pay on time and as billed.  [Filing No. 316 at 46.]  KBA points out that it was Companion—not KBA—that terminated the stop-loss contract, and KBA repeatedly reminded SLC to pay on time, as billed.  [Filing No. 316 at 46.]  KBA also argues that it did not breach the Agreement by failing to provide SLC with essential information about the Plan, including ongoing problems, because: (1) KBA was not required to remind SLC of its own contractual obligations; (2) KBA had communicated that a failure to pay its invoices on time and as billed would result in the Plan being underfunded; (3) SLC's stop-loss policy with Companion clearly stated that non-payment of a premium beyond the thirty-day grace period would automatically result in termination of the policy; and (4) KBA and SLC were in constant communication about SLC's failure to pay its invoices on time and as billed.  [Filing No. 316 at 50.]  KBA argues that the Agreement did not require KBA to avoid business relationships with RGI and Companion, and it did not establish any kind of fiduciary relationship that would create such a requirement.  [Filing No. 316 at 51.]  KBA argues that Section VI.2 of the Agreement "stands only for the proposition that KBA merely agreed to act as SLC's *agent* in providing certain services 'in the administration of the Plan' and did not *assume* SLC's duties (and liability) as the Plan's sponsor and administrator."  [Filing No. 316 at 52 (emphasis in original).]  KBA also argues that SLC's theory that KBA colluded with RGI, Companion, and Sirius (Companion's reinsurer) to terminate employers' stop-loss policies to save Companion and Sirius money is "based on nothing but pure speculation."  [Filing No. 316 at 52.]  KBA points to its Rule 30(b)(6) testimony indicating that

RGI did not consider SLC's potential large stop-loss claim when RGI determined that SLC's stop-loss policy was eligible for termination.  [Filing No. 316 at 52.]

In reply and in support of its Motion for Summary Judgment, and in response to KBA's Cross-Motion for Summary Judgment, SLC argues that KBA is attempting to rewrite its contractual obligations to SLC and that Angela Cromer, a KBA senior executive, confirmed that Section VI.2 of the Agreement "means that KBA will not act on behalf of anyone other than SLC in the administration of the plan."  [Filing No. 327 at 10 (citing Filing No. 285-3 at 14).]  SLC argues that the language of the Agreement is clear and unambiguous, and, even if it were ambiguous, it would be construed against KBA as the drafter.  [Filing No. 327 at 14.]  SLC also argues that KBA does not dispute that it created conflicts of interest, nor does it dispute that it knew SLC's stop-loss policy was in danger of termination, but it did not say anything to SLC about it.  [Filing No. 327 at 15-16.]  SLC argues that KBA failed to properly communicate with SLC and it merely included a "balance forward" amount in "one line in the middle of the [KBA] invoice, in 5-point font," which does not qualify as compliance with its duty to report critical information to SLC.  [Filing No. 327 at 25.]  SLC also contends that KBA failed to relay information to SLC from RGI about the stop-loss plan—specifically, RGI's President sent an email to KBA telling it that SLC had "a lot of claims on fund hold, and that needs to be addressed with [SLC]," but KBA said nothing to SLC.  [Filing No. 327 at 25 (citing Filing No. 285-8 at 44).]  Moreover, SLC argues, KBA deliberately decided not to send a lapse letter to SLC informing it that it was at risk of termination of its stop-loss policy due to its incomplete payments.  [Filing No. 327 at 27.]  Regarding KBA's alleged acquiescence, SLC argues that it does not matter that Companion was the party who could terminate the policy; instead, the issue is whether KBA's prior breach defense is valid.  [Filing No. 327 at 29.]  SLC argues that "[b]ecause [KBA] gave SLC no notice of default

or of its intent to no longer accept SLC's adjusted payments, the law precludes [KBA's] theory that SLC breached the contract first." [Filing No. 327 at 29-30.]

KBA counters in its reply in support of its Cross-Motion for Summary Judgment by first arguing that, at a minimum, SLC's breach of contract claim fails because it has not provided any evidence that it fully performed its part of the contract or any evidence that it suffered damages that were caused by KBA's alleged breaches.  [Filing No. 338 at 6.]  KBA also clarifies that although SLC argues that it actually overpaid, what really happened was "that the year end reconciliation of eligibility performed by KBA created an overpayment as reflected on the last 3 invoices," but it is undisputed "that SLC did not even pay those invoices until January 2016, at which point the year-end reconciliation established that SLC still owed KBA $1.1 million for those invoices."  [Filing No. 338 at 10.]

### 2. Construction of the Parties' Agreement

The Agreement provided that: "1. Nothing in this Agreement shall be construed as creating a fiduciary relationship between [KBA] and [SLC] or participants in the Plan," and "2. [KBA] shall act under this Agreement **solely as agent of [SLC] in the administration of the Plan**." [Filing No. 284-1 at 8 (emphasis added).]  The parties dispute the meaning of the bolded language, and the Court finds that "a reasonable person could find the [language] susceptible to more than one interpretation"—either it means that KBA will act merely as an agent for SLC (not as a fiduciary) or it means that KBA must act only on behalf of SLC (not on behalf of any other parties). Accordingly, the language is ambiguous, and the Court must construe the meaning. *Four Seasons Mfg., Inc. v. 1001 Coliseum, LLC*, 870 N.E.2d 494, 501 (Ind. Ct. App. 2007) ("A contract is ambiguous when it is susceptible to more than one interpretation and reasonably intelligent persons would honestly differ as to its meaning.").

18

The Court notes that the word that KBA's general counsel chose to use was "solely," as opposed to "merely," and also notes that the contract must be construed against the drafter—here, KBA. *Buskirk v. Buskirk*, 86 N.E.3d 217, 224 (Ind Ct. App. 2017). For these reasons, the Court finds that the bolded language means that KBA promised to act on behalf of SLC only, as SLC's agent, and not in the interest of any other party. This interpretation is also in keeping with Indiana agency law, which provides that "[u]nless otherwise agreed, an agent owes a duty to his principal to act solely for the principal's benefit." *Bopp v. Brames*, 713 N.E.2d 866, 8711 (Ind. Ct. App. 1999) (citing *Egan v. Burkhart*, 657 N.E.2d 401, 404 (Ind. Ct. App. 1995)).

### 3. Analysis of Breach of Contract Claim

Under Indiana law, "[t]o recover for a breach of contract, a plaintiff must prove that: (1) a contract existed, (2) the defendant breached the contract, and (3) the plaintiff suffered damage as a result of the defendant's breach." *Morris v. Crain*, 71 N.E.3d 871, 880 n.5 (Ind. Ct. App. 2017) (citation omitted). In reviewing the parties' cross-motions for summary judgment, the Court is mindful that "[p]arties have different burdens of proof with respect to particular facts; different legal theories will have an effect on which facts are material; and the process of taking the facts in the light most favorable to the non-movant, first for one side and then for the other, may highlight the point that neither side has enough to prevail" on summary judgment. *R.J. Corman Derailment Servs., LLC*, 335 F.3d at 648. This mutual insufficiency is present here. From KBA's perspective, it is undisputed that SLC failed to pay the KBA invoices on time and as billed as the Agreement required, which a jury could well find to be a breach of the Agreement. However, from SLC's perspective, it is undisputed that nobody at KBA explicitly warned SLC that it was facing imminent termination of its stop-loss policy, and a jury could well find the absence of such a warning violated KBA's contractual obligations including, but not limited to, the provisions

requiring KBA to "[r]eport to [SLC] essential information with respect to the Plan and the procedures there under (sic) and assist in distribution of the material furnished"; "[r]eport to [SLC] matters of general interest with respect to the Plan, e.g., problems of a recurring nature"; and "[s]ubmit to [SLC] a monthly accounting of payments made, with sufficient detail to provide for the tracking of funds used." [Filing No. 284-1 at 4.] Moreover, the undisputed evidence concerning the nature of KBA's relationship with RGI could be deemed by a jury as a breach of KBA's obligations as agent for SLC. *See Potts v. Review Bd. of Ind. Employment Sec. Div.*, 475 N.E.2d 708, 711 (Ind. Ct. App. 1985) ("Unless otherwise agreed, an agent is subject to a duty to his principal to act solely for the benefit of the principal. An agent may not place himself in a position wherein his own interests are potentially antagonistic to those of his principal.") (citations omitted); *Brannan v. Kelley*, 148 N.E. 157, 158 (1925) ("The agent must, as to his principal, exercise the utmost good faith. He cannot, without the knowledge and consent of his principal, serve two masters.")

Nevertheless, because a successful breach of contract claim requires that the complaining party has performed its obligations under the contract, *U.S. Research Consultants, Inc. v. Cnty. of Lake*, 89 N.E.3d 1076, 1086 (Ind. Ct. App. 2017), also at issue is whether SLC performed its obligations under the contract, or whether its failure to do so is excused by KBA's alleged acceptance of partial, untimely payments. The Court acknowledges that Indiana courts have recognized that a party can forfeit its right to declare a breach of an agreement where the party has historically allowed the breaches to occur. *See Scott-Reitz Ltd. v. Rein Warsaw Assocs.*, 658 N.E.2d 98, 104 (Ind. Ct. App. 1995) ("[W]hen a party deviates from strict performance called for by the contract, the former cannot suddenly declare the deviation a breach of contract. Notice must be given to the other party that strict performance will be required in the future, then if the party

continues to deviate, a default can be declared."). This principle has even been applied in cases where an anti-waiver provision was contained in the contract. *See T-3 Martinsville, LLC v. US Holding, LLC*, 911 N.E.2d 100, 116 (Ind. Ct. App. 2009) (finding that the anti-waiver provision was inapplicable to the circumstances because party's acquiescence was an issue of estoppel, not waiver).

Moreover, an issue remains as to which party's conduct caused the damages of which SLC complains. *See Wesco Distrib. Inc. v. ArcelorMittal Ind. Harbor LLC*, 23 N.E.3d 682, 708 (Ind Ct. App. 2014) ("In order to recover on a breach of contract claim, the alleged breach must be a cause in fact of the plaintiff's loss. . . . Where any injury arising from the breach of contract may have resulted from multiple causes, . . . the test is . . . whether the breach was a substantial factor in bringing about the harm.") (quotations and citations omitted).

A jury will have to determine the principal remaining issues in this case including: (1) whether one or both of the parties breached the Agreement; (2) whether SLC breached the Agreement first, thereby making it unable to bring a successful breach of contract claim against KBA because it has not performed its obligations; (3) whether KBA acquiesced to SLC's deficient payments thereby preventing KBA from claiming that SLC's untimely, insufficient payments are a default; and/or (4) whether SLC's or KBA's alleged breach caused the damages.[2] These are genuinely disputed issues and are fundamentally for the jury to decide. Therefore, the Court denies both parties' motions seeking summary judgment on SLC's breach of contract claim.

---

[2] Although not raised in their briefs in support of their motions for summary judgment, the matter of SLC's financial stability (as a potential reason for SLC's underpayments in 2015) is also at issue and will need to be evaluated by a jury.

### B. Claim for Breach of Fiduciary Duty Under ERISA

#### 1. The Parties' Arguments

Both parties also seek the entry of summary judgment in their favor on SLC's ERISA claim. SLC argues that KBA was a fiduciary under ERISA because it "had authority to determine whether a claim is payable under the terms of the plan," and it "managed Plan assets by establishing an account for the Plan's assets and paying Plan-related expenses from that account including claims and payment of, among other things, stop-loss policy premiums." [Filing No. 287-1 at 31] (internal quotations omitted).] SLC argues that KBA breached its fiduciary duties of loyalty and care to the Plan because it created conflicts of interest and failed to act solely in the interest of the Plan's participants and beneficiaries, instead acting in its own interest by protecting its business relationship with Companion, and in the interest of RGI, Companion, and Sirius, who were facing a $1 million stop-loss claim if SLC's stop-loss policy was not terminated. [Filing No. 287-1 at 31-33.] SLC argues that KBA's failure to inform SLC and the Plan about the imminent termination of the stop-loss policy violated ERISA. [Filing No. 287-1 at 33.] Separately, SLC argues that KBA also violated ERISA because it improperly paid claims, and SLC contends that KBA admitted it improperly paid claims. [Filing No. 287-1 at 33-34.] Finally, SLC argues that KBA violated ERISA by failing to timely provide requested claims information. [Filing No. 287-1 at 34.] SLC maintains that it "tried for years, starting in late 2015, to get claims data from [KBA], and [KBA] would not provide it until well into this lawsuit." [Filing No. 287-1 at 34.]

In response, KBA argues that it is not an ERISA fiduciary and did not breach any fiduciary duties. [Filing No. 316 at 53.] KBA contends that SLC's ERISA claim fails because: (1) the relevant documents (such as the Agreement) do not name KBA as a fiduciary; (2) KBA provided SLC with claims data upon request; and (3) SLC has not shown that KBA exercised discretion in

paying claims.  [Filing No. 316 at 59.]  KBA admits that its maintenance of an account holding SLC Plan assets makes KBA a fiduciary for the purpose of managing those assets; however, KBA argues that "SLC must prove that KBA 'was acting as a fiduciary (that is, performing a fiduciary function) when taking the action subject to the complaint.'"  [Filing No. 316 at 54 (quoting *Pegram v. Herdrich*, 530 U.S. 211, 226 (2000)).]  KBA argues that SLC has mischaracterized KBA's role in the claims process; KBA asserts that it performed purely ministerial functions and only performed the first level of review of claims, which does not make it a fiduciary.  [Filing No. 316 at 55.]  KBA argues that even if it was a fiduciary for the limited purpose of claims administration, its erroneous payment of some claims would not constitute a breach under ERISA because a fiduciary is not required to administer claims with 100% accuracy—although KBA came close with 99.73% accuracy, according to an audit)—but, instead, "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man . . . would use  . . ."  [Filing No. 316 at 57 (quoting 29 U.S.C. § 1104(a)(1)(B).]  KBA also challenges SLC's argument that KBA failed to provide SLC with claims data, arguing that there is no evidence in the record to support this assertion.  [Filing No. 316 at 59.]  Instead, KBA points to evidence demonstrating that it did, in fact, respond to SLC's requests.  [Filing No. 316 at 59.]  KBA also argues that SLC's complaints do not arise from KBA's handling of plan assets.  [Filing No. 316 at 59.]  Additionally, KBA argues that SLC has not identified any authority that required KBA to ensure SLC's stop-loss premiums were paid above all other Plan obligations, such as claims that were already underfunded.  [Filing No. 316 at 59-60.]  KBA argues that such an action would go against the Agreement's guidance on how payments would be allocated across the Plan's component parts. [Filing No. 316 at 61.]  KBA also argues that under ERISA, having a conflict of interest, on its own, does not create a breach of fiduciary duty, and "ERISA fiduciaries may 'wear different hats'

without breaching fiduciary duties to plan beneficiaries, so long as the fiduciary 'wear[s] only one at a time, and wear[s] the fiduciary hat when making fiduciary decisions.'" [Filing No. 316 at 61-62 (quoting *Pegram*, 530 U.S. at 225).]

In reply, SLC argues that the language in the Agreement disclaiming a fiduciary relationship was rejected by the Court two years ago "because these disclaimer clauses are void *per se* under 29 U.S.C. § 1110(a)." [Filing No. 327 at 36 (citing Filing No. 55 at 6 and Filing No. 41 at 8-9).] SLC also challenges KBA's argument about its "purely ministerial functions," arguing that discretion is not required to be a fiduciary for the purposes of using Plan assets. [Filing No. 327 at 36-37.] In any event, SLC argues, KBA did have discretion because the plan documents gave discretion to SLC *or its designee*. [Filing No. 327 at 40 (emphasis in original).] SLC also argues that KBA was a fiduciary because it exercised authority over Plan assets, and it breached this duty when it improperly used Plan assets to pay for services and products that are not covered by the Plan. [Filing No. 327 at 38.] SLC argues that 29 U.S.C. § 1104(a)(1)(D) requires that a plan fiduciary act "in accordance with the documents and instructions governing the plan"—here, the Agreement—and KBA failed to meet this requirement, thereby breaching its fiduciary duty. [Filing No. 327 at 43.] SLC also challenges KBA's argument that a fiduciary can wear "different hats," noting that the "different hats" in *Pegram* dealt with an employer being a fiduciary in one context but not in another, as opposed to a fiduciary playing both sides of a transaction and acting as an agent for RGI and Companion, opposite the Plan. [Filing No. 327 at 44.]

KBA counters in its reply in support of its Cross-Motion for Summary Judgment by first arguing that SLC has mischaracterized the Court's earlier ruling on KBA's motion for partial summary judgment: The Court did not affirmatively void KBA's disclaimer of fiduciary status in the Agreement, but instead, "refrained from ruling on the relevance of the [Agreement's] fiduciary

24

disclaimer and KBA's fiduciary status without the benefit of factual development through discovery, which it now has." [Filing No. 338 at 5 (citing Filing No. 55 at 6-7).]   KBA also reiterates its argument that it "was not an all-purpose fiduciary" just because it held Plan assets. [Filing No. 338 at 14.] KBA further argues that SLC did not delegate its discretionary authority to KBA. [Filing No. 338 at 15.] KBA contends that it did not breach any duties of loyalty, because it did not act in furtherance of a conflict of interest merely by providing Companion with facts about SLC's payments, as Companion was contractually entitled to those payments. [Filing No. 338 at 11.]   KBA also argues that the termination of a stop-loss policy is not a prohibited transaction under ERISA, because assisting with the administration of a stop-loss policy is not a transaction "involving the plan." [Filing No. 338 at 16.]   KBA argues that there is a distinction between SLC's Plan and SLC's stop-loss policy, such that nothing about the stop-loss policy involved the Plan, and although the termination of the policy might have been adverse to SLC's interests as the plan sponsor, it was not adverse to the Plan. [Filing No. 338 at 16-18.]   KBA argues that the prudent man standard of care applies to all of the subsections of 29 U.S.C. § 1104(a)—meaning that a failure to follow the plan documents does create a per se ERISA violation—and KBA is not liable for any such failure because it "was aware of the Plan's terms, took reasonable and prudent measures to follow the Plan's terms, did not intend to violate the Plan's terms, and its measures resulted in near-perfect compliance with the Plan's terms." [Filing No. 338 at 19-20.]

SLC sought leave to file a sur-reply in support of its Motion for Partial Summary Judgment, arguing that KBA's reply raised two new factual assertions that KBA did not previously address: (1) the stop-loss policy is not part of the Plan, [Filing No. 346-1 at 2]; and (2) "SLC had a chance to get current on its [stop-loss] premiums after SLC received the termination notice," [Filing No.

346-1 at 3 (quotation marks omitted) (alteration in original).]  SLC argues that KBA repeatedly

admitted in its cross-motion/opposition that the stop-loss policy was part of the Plan.  [Filing No.

346-1 at 2.]  SLC contends that the Agreement makes it clear that the stop-loss policy was part of

the Plan because the Agreement required that KBA "provide administrative services with respect

to [SLC's] Employee Welfare Benefit Plan," which included "[c]oordinat[ing] the purchase of

stop-loss insurance coverage and provid[ing] stop loss (sic) claim administration."  [Filing No.

346-1 at 2 (quoting Filing No. 284-1 at 1; Filing No. 284-1 at 5).]  SLC also notes that "[KBA's]

witnesses confirm that the stop-loss policy was an integral part of the Plan."  [Filing No. 346-1 at

2.]

KBA opposed SLC's Motion for Leave to file a sur-reply, [Filing No. 350], arguing that

"SLC is not entitled to a sur-reply because KBA did not 'cite[] new evidence' or 'object[] to the

admissibility' of SLC's evidence in its reply," and "there is nothing new about the assertions SLC

challenges in KBA's reply brief."  [Filing No. 350 at 1.]  KBA contends that it never "argued SLC

had an opportunity to cure its breach of its payment obligations after the termination of its stop-

loss policy"; what KBA was referencing was the undisputed fact "that SLC had many opportunities

to pay its delinquent invoices long before it did so."  [Filing No. 350 at 2.]  KBA further challenges

SLC's request to file a sur-reply by noting that KBA's position in its reply regarding the

relationship between the stop-loss policy and the Plan is a legal distinction, not a factual one.

[Filing No. 350 at 2.]  KBA also argues that these issues were direct replies to SLC's own

arguments—not brand-new arguments raised for the first time in KBA's reply.  [Filing No. 350 at

2-3.]

In its reply in support of its Motion for Leave, SLC argues that KBA "disregards [Local

Rule 56-1] and argues that it can make new arguments on reply so long as it does not introduce

new evidence." [Filing No. 353 at 2.]  SLC argues that because KBA raised these two issues for the first time in its reply brief and because KBA would not be prejudiced by the Court allowing SLC's short sur-reply, the Court should permit SLC to respond to the new issues raised in KBA's reply.  [Filing No. 353 at 4.]

Local Rule 56-1(d) provides: "A party opposing a summary judgment motion may file a surreply brief only if the movant cites new evidence in the reply or objects to the admissibility of the evidence cited in the response."   [LR 56-1(d).]  The Seventh Circuit has stated that "[t]he decision to permit the filing of a surreply is purely discretionary and should generally be allowed only for valid reasons, such as when the movant raises new arguments in a reply brief." *Meraz-Camacho v. U.S.*, 417 Fed. Appx. 558, 559 (7th Cir. 2011).  Although the parties characterize the issues differently, the Court finds that the issues presented in KBA's reply are distinct enough to be considered new arguments.  Accordingly, the Court **GRANTS** SLC's Motion for Leave to file a sur-reply and will consider the issues the parties discuss in the sur-reply, opposition brief, and reply brief.

### 2. Analysis of ERISA Breach of Fiduciary Claim

To succeed on a claim breach of fiduciary duty under ERISA, a plaintiff must prove that: (1) it has a right of action under ERISA (*i.e.*, that it is acting either as a plan fiduciary, beneficiary, or participant); (2) the defendant was a plan fiduciary; (3) the defendant breached its fiduciary duties; and (4) there is a cognizable loss to the plan flowing from that breach. *Sharp Electronics Corp. v. Metropolitan Life Ins. Co.*, 578 F.3d 505, 512 (7th Cir. 2009) (citations omitted). A defendant will be considered a plan fiduciary if it: (1) "exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of assets"; (2) "renders investment advice for a fee or other

compensation, direct or indirect, with respect to any moneys or other property of such plan, or has

any authority or responsibility to do so"; or, (3) "has any discretionary authority or discretionary

responsibility in the administration of such a plan." 29 U.S.C. § 1002(21)(A).  "[A] fiduciary shall

discharge [its] duties with respect to a plan solely in the interest of the participants and beneficiaries

and (A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries;

and (ii) defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1).  "[A]

person deemed to be a fiduciary is not a fiduciary for every purpose but only to the extent that he

performs one of the described functions." *Klosterman v. W. Gen. Mgmt., Inc.*, 32 F.3d 1119, 1122

(7th Cir. 1994).  A fiduciary must discharge its duties "with the care, skill, prudence, and diligence

under the circumstances then prevailing that a prudent man acting in a like capacity and familiar

with such matters would use in the conduct of an enterprise of a like character and with like aims,"

and "in accordance with the documents and instruments governing the plan insofar as such

document instruments are consistent with the provisions of this subchapter and subchapter III."

29 U.S.C. § 1104(a)(1)(B), (D).  A fiduciary also "shall not (1) deal with the assets of the plan in

his own interest or for his own account, (2) in his individual or in any other capacity act in any

transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse

to the interests of the plan or the interests of its participants or beneficiaries, or (3) receive any

consideration for his own personal account from any party dealing with such plan in connection

with a transaction involving the assets of the plan." 29 U.S.C. § 1106(b).  If a plan fiduciary

"breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this

subchapter," it "shall be personally liable to make good to such plan any losses to the plan resulting

from each such breach, and to restore to such plan any profits of such fiduciary which have been

made through use of assets of the plan by the fiduciary," as well as being "subject to such other equitable or remedial relief as the court may deem appropriate. . . ." 29 U.S.C. § 1109(a).

SLC alleges that KBA breached its fiduciary duties in several ways: (1) acting in the interests of itself, RGI, Companion, and Sirius; (2) failing to advise SLC that its stop-loss policy was going to be terminated; (3) improperly paying claims; and, (4) failing to timely provide requested claims data.  However, only the first two alleged violations are related to SLC's alleged damages—the termination of the stop-loss policy and the accompanying costs and expenses it incurred as a result.  The Court will first address these bases for SLC's breach of fiduciary claim before turning to the remaining two theories.

As noted, to prevail on its breach of fiduciary duty claim, SLC must establish that KBA's alleged breach resulted in a cognizable loss to the plan.  Here, the Court finds that the alleged damages were instead incurred by SLC, not the Plan.  Although SLC attempts to characterize the damages as ones suffered by the Plan by arguing that the stop-loss policy was an integral part of the Plan, this argument ignores key evidence demonstrating that SLC is seeking relief on its own behalf, not on behalf of the Plan.  First, in its Motion for Partial Summary Judgment, SLC alleges that KBA's "breaches of its duties to SLC caused SLC's stop-loss insurance, a vital component of its employee healthcare plan, to be terminated, causing SLC damages."  [Filing No. 287-1 at 1.] Second, the insured under the stop-loss policy was SLC, not the Plan.  See Filing No. 314-2 at 122-205.  There is no evidence that KBA's alleged actions in the interest of itself, RGI, Companion, and Sirius or its alleged failure to advise SLC that its stop-loss policy was going to be terminated led to "a cognizable loss to the plan."  Sharp Electronics, 578 F.3d at 512.  In Sharp Electronics, the Seventh Circuit upheld the dismissal of the plaintiff's ERISA breach of fiduciary duty claim, noting that "[a]t no point does Sharp explain how the alleged breach of fiduciary imposed (or could

29

have imposed) a loss on the Plan," and explaining that the damages for which Sharp was suing were "plainly damages and expenses to Sharp, as a company, not to the Plan. They [were] therefore not appropriate items of damage under either [29 U.S.C.] §1109(a) or §1132(a)(3)." *Id.* at 512-13. Similarly, here, the damages that form the basis of SLC's Complaint are the termination of its stop-loss policy and money that SLC had to expend as a result. These are clearly damages incurred by SLC, not the Plan. *See Trujillo v. Am. Bar Ass'n.* 706 Fed. Appx. 868 (7th Cir. 2017) ("[T]o redress ERISA violations or to enforce provisions of ERISA or a benefit plan, . . . [a plaintiff] must do so in the interest of the plan, not for his own benefit."); *see also Chua v. Shippee*, 2013 WL 4846689, *7 (N.D. Ill. Sept. 10, 2013) (citing *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 140 (1985)) ("Any recovery on a claim for breach of fiduciary duty inures to the benefit of the plan."). Therefore, SLC's claim for breach of fiduciary duty based on allegations that KBA acted in the interest of itself, RGI, Companion, and Sirius and/or failed to advise SLC that its stop-loss policy was going to be terminated fails, and KBA's Cross-Motion for Summary Judgment on these claims is **GRANTED**.

The Court now turns to SLC's allegation that KBA breached its fiduciary duty by improperly paying claims. As for the first element SLC must prove, the parties do not dispute that SLC has a right of action under ERISA based on its status as a plan fiduciary. [Filing No. 63 at 1 (admitting that "SLC is the named fiduciary and plan administrator . . . for an ERISA governed employee welfare benefit plan (the 'plan')"). The second element—whether KBA was a plan fiduciary and whether it was acting in that fiduciary capacity—is also met because it is undisputed that KBA established an account for holding SLC Plan assets and exerted control over the management and disposition of the assets. The Court finds that KBA was acting in that limited capacity (managing and disposing of Plan assets) when it paid the erroneous claims. *Chi. Dist.*

*Council of Carpenters Welfare Fund v. Caremark, Inc.*, 474 F.3d 463, 471-72 (7th Cir. 2007) ("To make out a claim for breach of fiduciary duty under ERISA, [plaintiff] must show that [defendant] was a fiduciary as that term is defined in the statute and that [defendant] was acting in its capacity as a fiduciary at the time it took the actions that are the subject of the complaint."). The next step, however, is to determine whether the erroneous payment of a few claims constitutes a breach of fiduciary duty.

ERISA requires that a fiduciary act prudently in administering claims. Payment of a few erroneous claims does not automatically constitute a breach of fiduciary duty. *DeBruyne v. Equitable Life Assur. Soc. of U.S.*, 920 F.2d 457, 465 (7th Cir. 1990). It is undisputed that KBA administered the claims with 99.73% accuracy, and there is no evidence that KBA acted imprudently when it paid the erroneous claims. The Seventh Circuit has recognized that "[t]he fiduciary duty of care . . . requires prudence, not prescience." *Id.* at 465 (citation omitted). SLC's claim that KBA breached its fiduciary duties by improperly paying claims fails because there is no evidence that KBA acted imprudently.

SLC's breach of fiduciary duty claim based on KBA's alleged failure to provide claims data also fails. There is no evidence that KBA failed to respond to requests for claims data. In fact, KBA has provided a detailed summary of the times it responded to requests for documents, and SLC has not challenged that list. Therefore, that claim fails as well.

Finally, SLC also argues that 29 U.S.C. § 1104(a)(1)(D) provides a separate basis for its breach of fiduciary duty claim. Specifically, SLC argues that 29 U.S.C. § 1104(a)(1)(D) requires that a plan fiduciary act "in accordance with the documents and instructions governing the plan"— here, the Agreement—and KBA failed to meet this requirement, thereby breaching its fiduciary duty. However, this claim fails because, again, SLC has failed to demonstrate there was "a

cognizable loss to the plan." *Sharp Electronics*, 578 F.3d at 512.  The damages for which SLC complains are damages incurred by SLC, not the Plan.[3]

   For these reasons, SLC's Motion for Partial Summary Judgment is denied because the claims raised do not relate to "a cognizable loss to the plan," *Sharp Electronics*, 578 F.3d at 512, nor does SLC establish a breach of the duty of prudence or to provide information as a matter of law.  KBA's Cross-Motion for Summary Judgment is granted as to all of SLC's ERISA claims.

## III.
### CONCLUSION

   The court has identified numerous genuine issues of material fact, which preclude the entry of summary judgment.  Accordingly:

   1.   SLC's Motion for Partial Summary Judgment, [283], is **DENIED**.

   2.   KBA's Cross-Motion for Summary Judgment, [304], is **GRANTED IN PART AND DENIED IN PART**.

   3.   SLC's Motion for Leave to File Limited, Four-Page Surreply, [345], is **GRANTED**.

The Court requests that the Magistrate Judge confer with the parties as soon as practicable to discuss the resolution of this matter short of trial.

---

[3] The Court also notes that the fiduciary claim against KBA regarding its compliance with the terms of the Agreement raises an issue not addressed by the parties: preemption.  This claim and the breach of contract claim are based on essentially the same conduct, so if the claim arose under ERISA, the breach of contract claim would be preempted.  29 U.S.C. § 1144(a) (ERISA "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan.");  *Ampere Automotive Corp. v. Employee Ben. Plans, Inc.*, 1992 WL 220912, *1 (N.D. Ill. Sept. 1, 1992) ("Even state law claims brought pursuant to state laws which do not specifically pertain to employee benefit plans are preempted if the claims arise directly or indirectly from the administration of such plans.").   It is unclear why the parties did not address this issue.  However, it is of no consequence, as this breach of fiduciary duty claim under ERISA fails because SLC is seeking relief for its own losses, and not any loss of the Plan.

Date: 4/28/2020

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only to all counsel of record**